UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-14134-CIV-MARRA/LYNCH

DARRELL ANDERSON,

     Plaintiff,

vs.

UNITED PARCEL SERVICE, INC.

     Defendant.

_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant United Parcel Service, Inc.'s Motion for

Summary Judgment [DE 19], filed September 6, 2006.  Plaintiff filed a response [DE 29] on

October 2, 2006 and Defendant filed a reply [DE 31] on October 5, 2006.  On November 7, 2006,

the Court held a hearing [DE 36] and permitted the reopening of discovery and granted Plaintiff

permission to file an amended response to the motion for summary judgment.  On January 11,

2007, Plaintiff filed the amended response [DE 40] and Defendant filed a reply [DE 47] on

January 22, 2007.  The Court has carefully considered the submissions and is otherwise fully

advised in the premises.

I.  Background

On August 23, 2005, Plaintiff Darrell Anderson ("Anderson" "Plaintiff") filed his First

Amended Complaint, alleging discrimination on the basis of race against Defendant United

Parcel Service, Inc. ("UPS" "Defendant").  Count I of the Amended Complaint alleges a

violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Count II of the Amended

Complaint states a violation of the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. §

760.10(1)(a).[1]  The Amended Complaint states that Plaintiff was unlawfully discriminated against by UPS when he was terminated from employment.

The facts, as culled from  affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in a light most favorable to Plaintiff, for the purpose of this motion,[2] are as follows:

UPS hired Plaintiff as a seasonal package car driver in 1996 and he later became a permanent full-time UPS package car driver in 1997. (Pl. Dep. 12-13, May 16, 2006.)   During Plaintiff's tenure at UPS, he was directly supervised by Jeff Coole and Dennis Cairns.  (Pl. Dep. 14-15.)  Starting in 2003, Eric Smith was the Center Manager and the Division Manager was Earl Hiott. (Pl. Dep. 15, 18.)  For the duration of his career with UPS, Plaintiff was the only black full-time package delivery driver in UPS's Fort Pierce Center. (Pl. Dep. 78.)

In April of 2002, Coole accompanied Plaintiff during his route to observe Plaintiff's performance. (Pl. Dep. 33, 67.)  During the ride, Plaintiff mentioned to Coole that he had a leg cramp. (Pl. Dep. 42-43.)  While observing Plaintiff, Coole repeatedly told Plaintiff that he was moving too slowly and that he needed to work faster. (Pl. Dep. 49.)  At some point during that ride, Coole ordered Plaintiff to give him the keys to the package car, but Plaintiff refused. (Pl. Dep. 47.)  Plaintiff then went into a business and asked a UPS customer to come outside and witness him handing the keys to Coole. (Pl. Dep. 47.)  Later, Plaintiff stayed outside while Coole

[1] The Amended Complaint refers to 42 U.S.C. § 1981 in the jurisdictional section but not in the enumerated counts. (Am. Compl. ¶ 1.)

[2] As dictated by Rule 7.5 of the Local Rules of the Southern District of Florida, all material facts set forth in UPS's statement of undisputed material facts that are supported by record evidence are deemed admitted, unless controverted by Plaintiff.

2

made deliveries. (Pl. Dep. 55.)  When Coole returned to the package car, he informed Plaintiff

that he had called Cairns to take Plaintiff back to the UPS center. (Pl. Dep. 55-56.)  Coole also

told Plaintiff that he had called the police. (Pl. Dep. 55.) When Cairns arrived, he asked Plaintiff

if he was able to perform his job to UPS's specifications. (Pl. Dep. 56-57.)  Plaintiff responded

that he could work, but admitted that he could not walk as fast as usual. (Pl. Dep. 57.)  After that

ride, Plaintiff was issued a warning letter for insubordination.  (Ex. 3, attached to Def. Notice of

Filing, DE 54.)

On June 12, 2002, Coole once again accompanied Plaintiff in his package car. (Pl. Dep.

33, 67.)  During the ride, Plaintiff stated that he wanted to go to lunch and Coole responded that

Plaintiff would take lunch when Coole told him to do so. (Pl. Dep. 70-71.)  Plaintiff informed

Coole that he had not eaten since the night before because he was fasting for his church and he

needed to eat at that time. (Pl. Dep. 71.)   Coole told Plaintiff that they needed to get work done

and that, if he took lunch, he would be terminated. (Pl. Dep. 71-72.)  Plaintiff insisted that he

needed to eat. (Pl. Dep. 72.)  Coole then instructed Plaintiff to go somewhere nearby, to a place

that they were passing while making deliveries, for lunch. (Pl. Dep. 72.)   Plaintiff insisted upon

going to "Hurricane Wings," where he always went for lunch. (Pl. Dep. 69, 74.)  Coole ordered

Plaintiff to give him the keys to the package car. (Pl. Dep. 69.)  Plaintiff proceeded to drive to

Hurricane Wings and then gave Coole the keys. (Pl.  Dep. 69.)  At that point, Coole took the

keys, drove away and returned to Hurricane Wings an hour later. (Pl. Dep. 74.)  Cairns then

arrived to take Plaintiff back to the center. (Pl. Dep. 74.)  Subsequently, Plaintiff received a

discharge letter for gross insubordination. (Pl. Dep. 75; Ex. 4, attached to Def. Notice of Filing.)

Plaintiff filed a union grievance pertaining to his discharge.  (Ex. 5, attached to Def. Notice of

Filing.)  That grievance was subsequently heard by the Southern Regional Area Parcel Grievance Committee, and Plaintiff eventually returned to work with ten days pay and the rest of the time to be served as a suspension (Ex. 6, attached to Def. Notice of Filing).

On March 28, 2003, Plaintiff received information in the form of a message to his pager that his daughter had been involved in a car accident and that she was being taken to the hospital. (Pl. Dep. 146.)   When Plaintiff arrived at his next delivery, he called the UPS Center, spoke to Cairns and told him that his daughter was involved in an accident and asked for permission to return to the Center. (Pl. Dep. 147.)  Cairns told Plaintiff that he could not give him permission without talking first to Smith. (Pl. Dep. 147.)  Plaintiff hung up the phone and called the Center on a different telephone line. (Pl. Dep. 147.)  Smith answered the telephone and began asking Plaintiff several questions regarding the accident. (Pl. Dep. 147.)  When Smith continued with the questions, and did not tell Plaintiff to bring the package car back to the Center, Plaintiff hung up the telephone. (Pl. Dep. 147-48.)  Plaintiff then telephoned Hiott, the Division Manager for Fort Pierce and Smith's direct supervisor. (Pl. Dep. 148; Earl Hiott Aff. ¶ 5; Eric Smith Aff. ¶ 8.) Plaintiff told Hiott that his daughter was involved in a car accident and Hiott told Plaintiff to take the truck back to the center and see about his daughter. (Pl. Dep. 148; Hiott ¶ 5.)  Hiott then telephoned the Center to discuss the issue with Smith. (Hiott ¶ 6.)  Smith told Hiott that he knew Plaintiff was returning to the Center and that Cairns was working on getting a cover driver to finish Plaintiff's route for the day. (Hiott ¶ 6; Smith ¶ 8.)  When Plaintiff returned his truck to the Center, Cairns and two other workers were there to divide up and deliver the remaining packages. (Smith ¶ 9.)

After changing his clothing and punching out on the time clock, Plaintiff went to Smith's

office to make sure that Smith knew that Hiott had given him permission to return to the Center. (Pl. Dep. 148-49.) Plaintiff told Smith, "there is one thing I want you to know about me, I don't allow anybody to come between me and my family . . . I'm a family man." (Pl. Dep. 149, 155.) Plaintiff went on to tell Smith "one day you will die and you will be judged by God for the way you treat people." (Pl. Dep. 149.) Smith then asked Plaintiff if Plaintiff was threatening him. (Pl. Dep. 149.) Plaintiff told Smith, "I'm not threatening you," "everybody" dies just like Abraham and Moses, "one day you'll die" and "one day I'll die." (Pl. Dep. 149.) Plaintiff then left Smith's office. (Pl. Dep.150.)

This incident left Smith "shaken," "very upset," "shocked, ""confused" and fearing for his life. (Smith Aff. ¶ 11.) Smith decided to call Hiott as well as Michael Swann, the UPS Employee Relations Manager. (Smith Aff. ¶ 11.) Smith told Hiott that Plaintiff stood between him and the door to his office, blocking Smith from leaving and leaning over the desk. (Hiott Aff. ¶ 7.) Plaintiff claims he never stood, blocked or threatened Smith's life. (Anderson Aff. ¶ 17.) Swann told Smith to call the police and file a report, which Smith did, and Hiott, based on Smith's report of what occurred, decided that Plaintiff should be discharged for violating of UPS policy by threatening his supervisor and engaging in gross insubordination. (Smith Aff ¶ 11; Hiott Aff. ¶ 7.) According to Hiott, the real issue was Anderson's repeated use of the phase "you're going to die" during his exchange with Smith. (Hiott Aff. ¶ 8.)

When Plaintiff returned to work on April 1, 2003, Hiott asked him to come into the office to speak to him. (Pl. Dep. 151.) Inside the office were several police officers. (Pl. Dep. 151.) Hiott asked Plaintiff to explain the incident and when Plaintiff finished, Hiott told him that Smith claims that you burst into his office, reached over his desk, and screamed that you were going to

5

kill him. (Pl. Dep. 151.)  Plaintiff acknowledged that he told him that he would die one day and

have to give an account to God for the way he treated people. (Pl. Dep. 151.)   Plaintiff claimed

that he did not intend the statement to be a threat. (Hiott Aff. ¶ 9.)  Hiott explained to Plaintiff

that Smith took his statement as a threat and, as a result, Hiott had no choice but to discharge

Plaintiff from UPS. (Hiott Aff. ¶ 9; Ex. 9, attached to Def. Notice of Filing.)

Plaintiff filed a union grievance in response to this discharge. (Pl. Dep. 157; Ex. 10,

attached to Def. Notice of Filing.)  The grievance process resulted in the discharge of Plaintiff

from UPS. (Pl. Dep. 171; Hiott Aff. ¶ 10.)

Plaintiff believes that he was "totally mistreated by UPS and its managers because [he]

was the only black driver there." (Pl. Dep. 172, 175.)  Plaintiff stated that he received more

discipline than other white drivers and white drivers committed "terminable offenses," but were

not fired. (Pl. Dep. 175.)  For example, Linda Winkle, a white woman, was involved in an

unreported accident in which she ran into a wall and was not fired. (Pl. Aff. ¶ 3.)  Mike Dahan, a

white man, was involved in "three high claim accidents," two of which involved individuals

needing to be seen in the emergency room. (Pl. Aff. ¶ 4.)  Wayne Sewell, a white man, and

Elaine Bath, a white woman, each overturned their trucks. (Pl. Aff. ¶ 5.)   None of these

individuals were fired.  Additionally, Bruce Orio, a white man, misdelivered packages and

received no discipline. (Pl. Aff. ¶ 7.)  Plaintiff does not know whether other black drivers or

other non-black drivers made similar comments to Smith and were not fired. (Pl. Dep. 202-03.)

Plaintiff testified that a white driver, named Jason Williamson, was allowed to continue to drive

even after an injury that required him to wear a metal brace on his leg. (Pl. Dep. 97, 126.)

Williamson was given a safety ride upon his return to work after surgery to make sure he was

working safely and could perform his job to UPS's specifications. (Williamson Aff. ¶¶ 6, 7.) Williamson was never permitted to work slower than normal, nor did he request to do so. (Williamson Aff. ¶ 8.)

On April 11, 2002, Plaintiff filed a charge of discrimination with the EEOC. (Pl. Dep. 120; Ex. 7., attached to Def. Notice of Filing.)  That charge included allegations against Jeff Coole, including the April 10, 2002 incident. (Ex. 7, attached to Def. Notice of Filing.) Plaintiff received a notice of a right to sue dated March 20, 2003. (Pl. Dep. 141; Ex. 8, attached to Def. Notice of Filing.)   Plaintiff did not file suit within 90 days of receiving the March 20, 2003 Notice of Right to Sue. (Pl. Dep. 142.)

Plaintiff filed a charge of discrimination with the EEOC on September 17, 2003 with respect to his termination. (Sept. 17, 2003 Charge, Ex. A, attached to Am. Compl.)  Plaintiff claimed that UPS retaliated against him for filing the April 11, 2002 charge.  (Sept. 17, 2003 Charge, Ex. A.)  In addition, Plaintiff claimed that his discharge on April 1, 2003 was racially motivated. Plaintiff received a notice of right to sue on January 28, 2005. (Notice of Right to Sue, Ex. B, attached to Am. Compl.)

Defendant argues it is entitled to summary judgment on both counts of the Amended Complaint based on 1) the lack of evidence that any similarly situated non-Black employee was treated more favorably than Plaintiff; 2) the existence of a legitimate, nondiscriminatory reason to discharge Plaintiff; 3) the failure of the Amended Complaint to plead a claim for retaliation and 4) the lack of a casual connection between the alleged retaliation and the protected activity.

## II. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III. Legal Discussion

A.  Title VII Race Discrimination Claim

1  McDonnell Douglas Framework

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Where direct evidence of discrimination is unavailable, a Title VII plaintiff may establish a prima facie case of discrimination through circumstantial evidence under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See also Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997).

Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) the plaintiff belongs to a racial minority group;  (2) he was subjected to adverse job action;  (3) his employer treated similarly situated employees of other races more favorably and (4) he was qualified to do the job.  See Holifield, 115 F.3d at 1562; see also McDonnell Douglas, 411 U.S. at 802.  "Demonstrating a prima facie

9

case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562 (citations omitted).

With respect to the third element of a prima facie case, the plaintiff must show that " 'the employees are similarly situated in all relevant aspects . . . In determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Knight v. Baptist Hosp., Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) quoting Holifield, 115 F.3d at 1562; see also Osram Sylvania, Inc. v. Teamsters Local Union 528, 87 F.3d 1261, 1265 (11th Cir. 1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts."); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (citations and internal quotations omitted).

If a prima facie case has been shown, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802.  The defendant's burden is one of production; it need not persuade the court that it was actually motivated by the proffered reasons. See Chapman v. A1Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (internal citations and quotations omitted).  This intermediate burden is "exceedingly light." Holifield, 115 F.3d at 1564 (internal citations and quotations omitted).

If the defendant satisfies the burden of production, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the

employer were not the real reasons for the adverse employment action.  See Chapman, 229 F.3d at 1024; Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

In other words, the plaintiff may attempt to demonstrate that the proffered reason was merely a pretext for the defendant's acts.  See Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Pretext means more than inconsistency; pretext means that the employer's decision was motivated by race.  Silvera, 244 F.3d at 1261.  The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perception of his performance.  See Holifield, 115 F.3d at 1565. The plaintiff must "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1457 (11th Cir. 1997).  Moreover, if the proffered reason offered by the employer is "one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

Finally, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  Chapman, 229 F.3d at 1024-25.

11

2.  Application of <u>McDonnell Douglas</u> Framework to Plaintiff's Case

      a. Prima Facie Case

Applying the <u>McDonnell Douglas</u> framework to the case at bar, the Court first considers whether Plaintiff has established a prima facie case of discrimination.  There is no dispute that Plaintiff belongs to a racial minority group, was subjected to an adverse job action, and was qualified to do the job.  Thus, the Court's inquiry must examine if a similarly situated non-Black employee was treated more favorably than Plaintiff.

Plaintiff claims that the prima facie case is met based on "a number of incidents of more favorable treatment of white employees and increased scrutiny of his own work by his supervisors." (Pl. Resp. 7.)  In addition, Plaintiff states that "a number of white drivers who were involved in on-the-job vehicle accidents [were] not disciplined in any fashion." (Pl. Resp. 7-8.) Significantly, Plaintiff points to no evidence of any white employee who was not terminated for threatening a supervisor.  Instead, Plaintiff merely notes that several white employees were involved in vehicular accidents and one white employee misdelivered a package. (Pl. Aff. ¶¶ 3-7.)  This evidence, however, fails to show that Plaintiff was terminated for conduct nearly identical to conduct engaged in by non-Black drivers.  <u>See</u> <u>Silvera</u>, 244 F.3d at 1259 ("in order to satisfy the similar offenses prong, the comparator's  misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.") <u>quoting</u> <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368-69 (11th Cir.1999) (internal citation and quotation marks omitted).  The failure to identify incidents involving the same conduct with the same supervisor regarding a similar work rule is fatal to establishing a prima facie case.  <u>See</u> <u>Silvera</u>, 244 F.3d at 1259 ('[t]he most important factors in

12

the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed"); Hawkins v. Ceco Corp., 883 F.2d 977, 985 (11th Cir. 1989) (disciplinary measures given for violation of different work rules not comparable).

Nonetheless, Plaintiff argues that it is not necessary to produce evidence of a comparable, white employee who was not discharged for threatening a supervisor.  Plaintiff claims that he may succeed in establishing a prima facie case of discriminatory animus through the use of circumstantial evidence as set forth in Cooley v. Great Southern Wood Preserving, 138 Fed. Appx. 149 (11th Cir. 2005).  (Pl. Resp. 7.)  The Court rejects this argument.  Cooley is an unreported case and therefore cannot be viewed as binding precedent.  Moreover, although Cooley cites Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1322-24 (11th Cir. 1998) as authority for the position that a prima facie case of discriminatory animus can be proved through the use of circumstantial evidence, Jones did not so hold.  Instead, Jones simply stated that it "*assume[d]* for the sake of argument" that a plaintiff might be able to establish a prima facie case in this manner, but Jones did not make this the law in this Circuit.  Jones, 151 F.3d at 1322-23 (emphasis in original).

The Eleventh Circuit has stated that a prima facie case of discrimination may be established by either the plaintiff "producing credible direct evidence of discriminatory intent" which then "shifts the burden to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached absent the discriminatory intent." Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988).  The alternative is for the plaintiff to present a prima facie case through circumstantial evidence under the McDonnell Douglas framework. Holfield, 115 F.3d at 1561-62.  Under the McDonnell Douglas framework, a plaintiff is required

13

to show that his employer treated similarly situated employees more favorably.  Id.  at 1562.

Furthermore, "if a plaintiff fails to show the existence of a similarly situated employee, summary

judgment is appropriate where no other evidence of discrimination is present." Id. (emphasis in

original omitted).  Besides the failure of Plaintiff to point to a similarly situated employee, he has

also failed to provide any other evidence of discrimination.  In other words, even with accepting

Plaintiff's legal argument, Plaintiff's argument is equally misguided with respect to the facts.

        For example, Plaintiff claims that a jury could infer that UPS was motivated by racial

animus based on the fact that white drivers were involved in package car accidents and received

no discipline and that Plaintiff was subjected to berating by a supervisor regarding his lunch

break and driving with a leg cramp. (Pl. Resp. 7-8.)  Plaintiff provides no evidence regarding the

disciplining of other white package car drivers outside of his statements made in his affidavit.[3]

Even assuming no white package car drivers were terminated for accidents, that fact hardly

provides circumstantial evidence of racial animus against Plaintiff.  Significantly, Plaintiff does

not point to any evidence that black package car drivers involved in accidents were terminated.

        Likewise, Plaintiff's contention that he was "berated by his supervisor for driving with a

leg cramp and reported to the police while a white driver who has two knee surgeries and was

forced to wear a metal knee brace was allowed to drive with no interference" does not serve to

establish a prima facie case of disparate treatment either. (Pl. Supplemental Resp. 5.)  Plaintiff

received a warning letter for insubordination based on his failure to follow his supervisor's

instructions, not because he had a leg cramp.  The treatment of Williamson, who was permitted

---

[3] Although Plaintiff's affidavits states that several white drivers were not terminated for
package car accidents, Plaintiff's deposition is replete with statements that he could not speak for
other drivers. (Pl. Dep. 34, 37, 125, 193.)

to perform his job while wearing a leg brace, did not concern insubordination.  Thus, to the extent Plaintiff contends Williamson is a comparator, he is clearly wrong.  See Maniccia, 171 F.3d at1368-69 ("quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges").  Nor does the Williamson evidence give rise to a finding of discriminatory animus on the part of UPS.   Lastly, Plaintiff's complaint that he was berated by a supervisor with respect to the timing of his lunch break also does nothing to advance his claim of discriminatory animus. That incident, like the leg cramp, concerned insubordination by Plaintiff towards his supervisor. Although Plaintiff characterizes this occurrence as stemming from racial discrimination, Plaintiff's personal opinion is simply insufficient to withstand summary judgment.  See Holfied, 115 F.3d at 1564 and n.6 (plaintiff's opinion that he felt discriminated against, without more, is not enough to establish a prima facie case of race discrimination.)  In other words, these incidents provide no additional evidence of discriminatory animus.

Because the record is devoid of facts upon which a reasonable juror could find that Plaintiff has identified a similarly situated employee who was treated more favorably or that Plaintiff has pointed to evidence indicative of discriminatory animus, Plaintiff has failed to make out a prima facie case of discrimination.

b.  Legitimate, non-discriminatory business reason

Although the Court has concluded that Plaintiff has failed to set forth a prima facie case, the Court will, for the purpose of a complete record, examine whether UPS is able to state a legitimate, non-discriminatory reason for its discharge of Plaintiff.  Notably, Plaintiff does not

15

directly challenge UPS's contention that it terminated Plaintiff for his threats against Smith.[4]

Plaintiff does, however, state that "there is a strong dispute as to what was actually said," that a

jury could find that Smith was feigning fear, and that Smith's fear was not reasonable.  (Pl. Resp.

6-7.)   Plaintiff provides no record citation to support his contention that there is a bona fide

dispute regarding the words Plaintiff used when talking to Smith.  In fact, Plaintiff's deposition

testimony admits that he told Smith that "one day you will die and you will be judged by God for

the way you treat people." (Pl. Dep. 149.)   In any event, it simply does not matter whether Smith

was truly scared or even if  Plaintiff uttered "you will die."  What matters is Hiott's belief at the

moment he decided to terminate Plaintiff.  Chapman, 229 F.3d at 1030 ("an employer may fire an

employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at

all, as long as its action is not for a discriminatory reason.") In that regard, the unequivocal

evidence demonstrates that Hiott terminated Plaintiff because he believed Plaintiff used the

phrase "you will die." (Hiott ¶ ¶ 8-9.)

     Moreover, Plaintiff does not challenge the veracity of Hiott's testimony nor does Plaintiff

assert that Hiott was motivated by racial animus towards Plaintiff.  To be sure, Plaintiff now

insists that he did not intend for these words to be a threat.  Plaintiff's intention, however, is

entirely irrelevant to the inquiry here.  What is relevant is that Hiott believed that Plaintiff told

Smith that "[he] will die" and that Hiott believed that Plaintiff's statement constituted a threat of

physical violence against his supervisor.  (Hiott Aff. ¶ ¶ 8-9.)  Cf. Cooper v. Southern Co., 390

F.3d 695, 740 (11th Cir. 2004) (finding that when an employer believed an employee had falsified

---

[4] Plaintiff merely states that he was "terminated on the pretext that he had threatened Smith's life."  (Pl. Resp. 3.)

a computer entry, the relevant issue is not whether the employee actually falsified the record, but rather whether the employer honestly believed the employee falsified the entry).  As such, UPS has met its burden of demonstrating that it terminated Plaintiff for a legitimate and non-discriminatory reason.  Lastly, after careful review of the record, the Court finds there is no genuine issue of material fact regarding whether UPS's articulated reason is pretextual.  Thus, UPS is entitled to summary judgment on this claim.

### B.  Title VII Retaliation Claim

After reviewing the Amended Complaint, the Court finds that it fails to plead a claim for retaliation under Title VII.  However, Plaintiff argues that he was subjected to a retaliatory discharge based on the filing of a prior EEOC charge and states that "a retaliation claim may not have been pled with the utmost clarity" and requested leave "to amend the Complaint to clarify the claims if the Court feels such clarification is necessary."  (Pl. Resp. 3-4.)  To be sure, while "issues not raised in the pleadings may be treated as if they were properly raised when they either are tried by express or implied consent of the parties, or are included in a pretrial order, these exceptions are not applicable if an opposing party objects to the assertion of such a claim without the filing of a supplemental pleading." Cooley v. Great Southern Wood Preserving, 138 Fed. Appx. 149, 153 (11th Cir. 2005) quoting Steger v. General Elec. Co., 318 F.3d 1066, 1077 & n.11 (11th Cir.2003) (internal quotation marks omitted).  Here, UPS strenuously objects to any amendment of the complaint.[5]

---

[5] UPS noted in its summary judgment motion that although the EEOC charge attached to Plaintiff's Amended Complaint contains an allegation of retaliatory discharge, Plaintiff did not raise this issue during his deposition.  UPS reserved its right to seek summary judgment on this claim. (Def. Mot. 1-2 n.1.)

Clearly, the deadline for amendment of the complaint has long expired.  Cf. Sosa v. Airport Systems, Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) (when a motion to amend is filed after the deadline in the Court's scheduling order, the plaintiff must demonstrate good cause for the amendment).  The Amended Complaint simply did not plead this claim, and amendment of a complaint may not occur through argument in a brief opposing summary judgment. Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004). As such, the Court is entitled to reject even ruling on this claim.  Nonetheless, the Court will briefly examine this claim for the purpose of summary judgment.

1. Legal Framework

To establish a prima facie case for retaliation, Plaintiff must show that 1) he engaged in protected activity; 2) he suffered an adverse employment action and 3) there is some causal relationship between his protected activity and the adverse employment action. See Holifield, 115 F.3d at 1566.  "To meet the causal link requirement, the plaintiff `merely has to prove that the protected activity and the negative employment action are not completely unrelated'" Id. quoting E.E.O.C. v. Reichhold Chemicals, Inc ., 988 F .2d 1564, 1571-72 (11th Cir. 1993).  However, "[t]he plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff" and "[t]he employer's awareness of the statement may be established by circumstantial evidence."  Holifield, 115 F .3d at 1566 citing Goldsmith v . City of Amore, 966 F.2d 1155, 1163 (11th Cir. 1993); Weaver v. Casa Gallardo, Inc., 922 F .2d 1515, 1524 (11th Cir. 1991).

Once the plaintiff has established his prima facie case, the employer must proffer a

legitimate, non-discriminatory reason for the adverse employment action. Holifield, 115 F.3d at 1566 citing Reichhold Chemicals, Inc., 988 F.2d at 1571-72. If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. Holifield , 115 F .3d at 1567 citing Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994); Goldsmith v. City Atmore, 966 F .2d 1155, 1163.

    2.  Application of the Law to Plaintiff's Case

    Applying the above-discussed framework to the case at bar, the Court first considers whether Plaintiff has established a prima facie case of retaliation.  There can be no dispute that Plaintiff engaged in protected activity (the filing of an earlier EEOC charge) or suffered an adverse employment action (termination of employment).  The Court will now consider whether there is evidence of a causal relationship between Plaintiff's protected activity and his termination.

    Plaintiff filed his first EEOC charge in April of 2002 and he was terminated in April of 2003, one year later. The Court finds that the one-year period present in this case does not meet the necessary close temporal proximity between the protected conduct and the adverse employment action.  See, e.g., Maniccia, 171 F.3d at 1370 (15-month period between the grievance and adverse employment action is too long to establish causation); Walton v. Johnson & Johnson Svcs., Inc., 203 F. Supp. 2d 1312, 1321 (M.D. Fla. 2002) aff'd 347 F.3d 1272 (11th Cir. 2003) (no causal connection between termination six months after sexual harassment occurred); Bonham v. Regions Mortgage, Inc., 129 F. Supp. 2d 1315, 1328 (M.D. Ala. 2001) (no causal connection when a year and one-half passed between alleged retaliation and protected

19

activity); cf. Wascura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (a three and one-half month period between protected activity and termination does not standing alone show pretext).

Significantly, Plaintiff does not argue that the passage of a year constitutes sufficient temporal proximity. Instead, Plaintiff urges the Court to utilize a different formula in calculating temporal proximity. According to Plaintiff, the EEOC mailed its Notice of Dismissal of Plaintiff's first EEOC charge on March 20, 2003 and Plaintiff was fired two weeks later. (Pl. Resp. 5.) Plaintiff argues that the closing of Plaintiff's EEOC case triggered Plaintiff's termination, but fails to provide authority in support of this position. Nonetheless, even assuming that the temporal proximity requirement could be met in this fashion, the Court finds that UPS has met its burden of producing a legitimate, nondiscriminatory reason for terminating Plaintiff.

The record evidence demonstrates that once Hiott knew that Plaintiff had threatened Smith by telling him that he would die, Hiott concluded that Plaintiff must be terminated. Based on this record, the Court finds that Defendant has met its burden in producing a legitimate, nondiscriminatory reason for terminating Plaintiff. Furthermore, Plaintiff has pointed to no evidence, even when viewed in the light most favorable to him, that casts UPS's proffered reasons for Plaintiff's termination into sufficient doubt to create a jury question. Nor has Plaintiff pointed to evidence that demonstrates that his protected activity was more likely the reason for his termination. For these reasons, the Court finds that Plaintiff has not presented sufficient evidence of pretext. Accordingly, the Court concludes, as a matter of law, that Plaintiff has not prevailed on his retaliation claim and Defendant is therefore entitled to summary

judgment on this claim.[6]

### III. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant United Parcel

Service, Inc.'s Motion for Summary Judgment [DE 19] is **GRANTED**. The Court will separately

enter an order of judgment.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 13th day of March 2007.

_____

KENNETH A. MARRA
United States District Judge

copies to:

All counsel of record

_____

[6] Defendant briefly addresses several claims which Plaintiff does not advance in his responses to the summary judgment motion. These claims include a racially hostile work environment, a claim brought pursuant to 42 U.S.C. § 1981 and a claim brought under the Florida Civil Rights Act, Fla. Stat. § 760.01. Of course, the Court's granting of Plaintiff's Title VII claims doom Plaintiff's claim under section 1981. Standard v. A.B.E.L. Svcs, 161 F.3d 1280, 1282 (11th Cir. 2002). The same is true for Plaintiff's claim under the Florida Civil Rights Act. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Plaintiff's Amended Complaint did not plead a hostile work environment claim, and it is thus unnecessary for the Court to address this issue. Given that the Court is granting UPS's motion for summary judgment, the Court need not rule on UPS's application for a finding that Plaintiff is not entitled to punitive damages as a matter of law.